We'll now move to the first case on the regular calendar, that's XY Planning Network v. SEC. Let me just make sure Council is here. Ms. Mercury, you'll have to help me with that one, that's a lot of syllables for me. Yes, this is Esther Mardukieva on the line for the State Petitioner. Could you pronounce your name again for me one more time? It's Mardukieva. Mardukieva. That's good. All right. And then you're splitting your time with BPAC Guptak, is that right? Yes, Your Honor. Okay. And so five minutes of an initial argument from Ms. Mardukieva and four minutes from Mr. Guptak, and then you each reserve two minutes and one minute respectively for rebuttal, is that right? Yes, it is. Okay. And Mr. Berger, you're here for the SEC, is that right? Yes, Your Honor. Jeff Berger for the SEC. I'm here. Okay. All right. So let's proceed with the argument. Thank you very much, Your Honor. May it please the Court, Esther Mardukieva for the State Petitioner. In 1940, Congress determined that any person who engages in the business of advising others about the value of securities or the advisability of investing in, purchasing, or selling securities is an investment advisor subject to a fiduciary duty unless he or she falls within a statutory exception. The only exception available to broker-dealers requires that any advice they provide be solely incidental to their brokerage business and without special compensation for that advice. This exception tracks the distinctions between broker-dealers and investment advisors at the time of the Advisors Act. Those distinctions have since collapsed, and both groups of professionals now offer substantially similar personalized investment advice to retail customers. Section 913 of the Dodd-Frank Act confirmed Congress' intent, dating back to the Advisors Act, that such advice be subject to a fiduciary obligation. At the same time, Congress gave the SEC a tailored regulatory tool to allow for differential treatment of certain other aspects of the broker-dealer business model while preserving the core fiduciary duty. What the Dodd-Frank Act did not allow and could not allow in light of the Advisors Act was for the Commission to impose something other than a fiduciary duty on the personalized investment advice regulated by the final rule. The final rule is contrary to law, in excess of statutory authority, arbitrary and capricious, and must be set aside. I'll begin with our statutory argument, unless the Court has questions about Article III standing. Once the SEC determined that at least some broker-dealers were providing more than incidental personalized investment advice, the SEC was required to take regulatory action. On pages 2 and 20 to 24 of the Special Appendix, the SEC and the final rule engages in a description of the type of conduct and advisory services that fall within the scope of the final rule. Those services are advice that presumptively is subject to the Advisors Act, and there is no wholesale exemption to the Advisors Act for broker-dealers. Therefore, the SEC was required to either regulate broker-dealers under the Advisors Act, subject to a lawful interpretation of the statutory exception, or to pass a regulation that imposed the standards provided in Section 913G, and it did neither. This is Judge Park. Could I pause you there for a second? Yes, of course. The SEC could have done nothing, right, and that would have left the status quo in place, which is the suitability framework that's been developed in the courts. But even if you win and we set aside the rule, it would go back to the status quo, which is suitability and not a fiduciary rule, right? Well, Your Honor, we disagree that the SEC could have taken no action. Our position is that once there was a predicate factual determination that broker-dealers were providing the type of personalized investment advice that is no longer solely incidental to their brokerage business, that finding triggered regulatory consequences. And that finding, again… Which provision? Can you direct me to the where in Dodd-Frank or wherever else you get that from? Well, that conclusion derives from the text of the Advisors Act itself. Section 15 U.S.C. 80B-2A sub 11, which is a definitional provision of the Advisors Act, broadly defines investment advisor as any person who engages in providing advice about the value or advisability of investing in securities. And the exception is very narrow for broker-dealers. It is not a wholesale exception. It provides that the exception applies to any broker-dealer whose performance of advisory services is solely incidental to the conduct of his business as a broker or a dealer. If Congress had intended to create a wholesale… You have one minute left. Thank you. If Congress had intended to create a wholesale exemption for broker-dealers, it could have done so. And indeed, in the very next sub-provision of the Advisors Act definitional section, there is a wholesale exemption for the publisher of any bona fide newspaper, news magazine, or business or financial publication. But the language of the statute is may, right? Well, that is the language in the Dodd-Frank Act. And that language must be read at the same time as the Advisors Act. The use of the word may in the Dodd-Frank Act reflects that the SEC had options within the statutory framework that applies to investment advice, which is both the Dodd-Frank Act and the Advisors Act. So, once there is this predicate finding of advisory services that falls outside of the exception, there are really only two options for the SEC. Either regulate that advice under the Advisors Act, which is longstanding and has a definitional provision dating back to 1940, or use this precise regulatory tool that the Dodd-Frank Act provides, which imposes a fiduciary duty, but also allows for differential treatment of some aspects of the broker-dealer business, like receiving commissions or being able to sell proprietary products and not having a duty to continually monitor. But those are the two options. The use of the word may does not grant the agency unfettered discretion. That discretion is always cabined by existing statutes. And the Advisors Act is the existing statute that cabins that discretion. This is Judge Nardini. Just so I understand your claim here, are you arguing that in light of the language that you cited from the Investment Advisors Act, the SEC should have adopted the regulations as you are arguing they should have, irrespective of whether Dodd-Frank had ever even been passed? Your Honor, our position is that once the SEC made a finding of the type of services that were being provided, and it was clear that those services are no longer solely incidental to brokerage, then treatment under the Advisors Act was the default. Okay, but just back up to my question. Could you answer my question? Yes, I was just about to get there, Your Honor. Dodd-Frank simply reinforces that conclusion. So the answer is yes? The answer is that the Advisors Act independently requires the imposition of a fiduciary duty on non-incidental investment advice. But again, let me just go back to make it really clear what my question is. Is your position that the SEC should have adopted the regulations as you proposed that you believe that they should have been, by virtue of the Investment Advisors Act, irrespective of whether Dodd-Frank had ever been passed? That is my question. Yes, and my answer is yes, once the predicate factual finding of the type of services offered by broker-dealers had been made. Right. Given the state of the facts and given the state of the world, you're saying that Dodd-Frank basically then has nothing to do with our decision-making here. You're basically saying that even if Dodd-Frank had never been passed, the same arguments are made, you win. We do think Dodd-Frank is material to this case. I think our position is that the Advisors Act imposes an independent obligation on the commission to impose a fiduciary duty, and the Dodd-Frank Act reinforces that obligation rather than diminishes it. The SEC's position is that Dodd-Frank's use of the term may essentially gives the SEC discretion to do whatever it wants with respect to the standard of conduct that it imposes. But the Dodd-Frank Act must be read in conjunction with the Advisors Act. So why didn't Congress use must? If you're saying that there's only one permissible outcome, it's got to be the fiduciary standard across the board, why did Congress say may? Why didn't they just say must? Well, Your Honor, with respect to the fiduciary duty, there is only one outcome, but there are other aspects of Section 913 that would allow for differential treatment as against the Advisors Act standard. And that is the purpose of the word may in Dodd-Frank. Dodd-Frank wanted to give the SEC an opportunity to conduct a study to determine the regulatory options that are available. And if you look at subsection 913C, sub 9 and 10, that is Congress's direction to the SEC about what regulatory approaches to consider. And Congress directed the SEC to consider only those regulatory approaches. It was the approach of imposing the Advisors Act obligations wholesale or imposing the 913G standard or recommending to Congress to repeal the solely incidental exception altogether. Every single one of those options would require imposing the fiduciary duty on personalized investment advice. But other aspects of the broker-dealer business model could be regulated differently. What this shows is that Congress cared about this core fiduciary duty but did leave discretion to the SEC to figure out how to regulate other aspects of the broker-dealer business model. And it's important to note that in the 913 study itself, the only regulatory options that the SEC studies and was tasked with studying are options that would impose the fiduciary duty. There are variances amongst other types of regulation, including whether to impose other aspects of the Advisors Act or whether to use 913G, which includes carve-outs for certain aspects of the broker-dealer business model. But Congress's direction to the SEC was to look at options that would impose the fiduciary duty. And that is what the section 913 study did. And I would note that the section 913 study not once mentioned 913F as a source of regulatory authority, which would be exceedingly odd if 913F in fact worked as a broad source of rulemaking authority that the SEC claims. If it was in fact a grander rulemaking authority to adopt any substantive standard of conduct for this type of service for broker-dealers, the section 913 study would have discussed it in that manner. And the absence of any such discussion really precludes a conclusion that 913F is its own source of independent rulemaking authority. All right. Let's stop there. And now we'll hear from Mr. Gupta for four minutes. Thank you, and may it please the Court, Deepak Gupta for Petitioners Ford Financial and XY Planning Network, collectively representing more than 1,000 financial planners nationwide. It is true, as Your Honor's questions have brought out, that Congress used the word may. It also used the word shall. And so the statutory interpretation question in this case is what to make of the use of those words. And I think this is an issue of statutory interpretation that can be resolved by resort to the plain text. In 2010, Congress legislated against a set of dual overlapping and confusing regulatory regimes whose distinctions had become obsolete. Congress did, in our view, give the agency discretion. And so we are willing to grant the premise of the SEC's argument that the SEC could have done nothing. But the best way to read the statute is that Congress commanded that if the SEC chose to write a regulation, that Congress set a floor. And that floor was that the SEC had to harmonize the two regimes to create the same standard of conduct to govern the people who did the same thing, with flexibility to the agency to do more or other actions if it so chose. But the agency decided that it knew better than Congress, and it ultimately adopted a contrary policy choice, doubling down on the existing regulatory confusion. So as I said, I think the plain text of the statute resolves this question. And the first place to look is the difference between the language in Section 913 F and the language in 913 G. 913 F allows the SEC to, quote, commence a rulemaking, but only Section 913 G specifies as a substantive matter, what rule the SEC may, quote, promulgate and what that rule may provide. And if you look in the entire United States Code, you will see that authorizations to promulgate rules as a substantive matter use words like promulgate and provide. They do not use words like commence a rulemaking, which refers to the initiation of a process. It does not specify the result of this process. So the differences in these words matter. And commence makes sense in Section 913 F because Congress, all the five subsections of 913 that precede the substantive provision are about process. They specify that the agency had to do a study. It gave the agency only six months to do that study. And then it instructed the agency that if it so chose, after doing that study, it could commence a process that would, that had to consider the results of that study. But it is in the very next section of the Act, Section 913 G, that Congress specified the rule that the SEC had to promulgate and where Congress told the SEC what that rule, at a minimum, had to provide. And Congress could not have been much clearer on the subject. It said that the standards of conduct shall be the same for broker-dealers and investment advisors. The agency does not even try to justify the regulation that it promulgated on the basis of that statutory provision. The SEC concedes. I have a question about standing. As I understand it, your claim is that Reg B.I. would injure you relative to, or I guess your member clients would injure them relative to the fiduciary rule if that were the alternative. But as opposed to the status quo, I don't really understand how imposing more requirements on your competitors would harm you. Okay, so I, Judge Park, I do agree that baselines are important here. And I think it's important to emphasize that our theory is that we have standing when the baseline is the status quo ante. The rule causes us competitive injury because it further exacerbates confusion about the applicable regulatory standards. And Reg B.I. makes it more difficult for consumers to differentiate between financial planners who are bound by fiduciary obligations and for broker-dealers who may consider their own financial interests. It uses very similar terminology and therefore just doubles down on the confusion that the Commission's own study already shows is prevalent in the marketplace. And so what the regulation does relative to the status quo, not relative to a fiduciary rule, is harms our ability to compete based on our main selling proposition, which is that we are held to a high standard. And additionally, XY Planning Network, which is a network of financial planners, is harmed because our business model depends on financial planners having incentive to register as investment advisors. So even though the new – I'm sorry. No, go ahead. Follow-up. You started this line. Go ahead. Just, yeah, quick follow-up. So even if the new rule imposes more regulation on your competitors, the potential confusion of customers that they can't distinguish between best interest or fiduciary suitability is what causes harm to your clients' ability to advertise. Is that – am I getting that right? Yes, that's a correct characterization, Judge Park. And I would just say that that theory of standing is not unusual in the competitor standing arena because regulations often do different things, some of which create burdens and some of which create benefits. We don't have to show that everything the regulation does is good for our competitors and bad for us. The relevant question is, have we identified an injury as a result of competing in the same marketplace that is caused by the regulation that we're challenging relative to the status quo ante? And we have done so under well-established standards of competitor standing. If the court has no further questions, I'll reserve for rebuttal. Thank you. Did you have a question, Judge Park? No, I was just saying thanks. Thank you. All right. We'll now hear from Mr. Berger. Good morning, and may it please the court, Jeff Berger for the Securities and Exchange Commission. Regulation best interest enhances the standard of conduct that broker-dealers must provide to retail customers when making recommendations as part of their business of effecting securities transactions. In adopting regulation best interest, the commission balanced two related objectives. First, protecting investors by improving the quality of recommendations and reducing the risk of harm from conflicted advice. And second, preserving investors' ability to choose among firms that offer different services and different fee structures. Now, I want to get to the merits of the authority point, but I do think I need to go into standing first, because the court shouldn't even reach the merits due to petitioner's lack of Article III standing. And the primary standing problem for petitioners, who, again, are not directly regulated by regulation best interest, is that they premise their appeal on what the commission didn't do and wasn't required to do. And I need to start with regressibility. It's fatal here, because as XYPN conceded, they agreed that the commission could have done nothing. So, if the court were to vacate regulation best interest, what you'll have is then a reversion to a suitability regime with no mandate for the commission to adopt any new rule, let alone the new rule petitioners have suggested. That would result in less investor protection, harming the state, and lower burdens for the competitors of XYPN and its members. I'm sorry, Justice Judge Nardini. My impression of their argument was slightly different, and I guess they can correct me. But my understanding was that they were saying the statutory language in the abstract could have allowed the SEC to choose between a fiduciary standard or nothing. But then, as the regulatory process played out, it would have been arbitrary or capricious to make the first choice, meaning to choose nothing. Is that not your understanding of what their argument? Maybe I'm misconstruing what their argument is. That is not my understanding of the argument. And if you look at page 23 of the opening brief of XYPN, they say that the commission had the authority under Dodd-Frank not to issue a regulation. So my understanding of their argument, which I think is the correct reading of the statute, is that the commission has no obligation to do anything. That goes to the discretionary language of the statute. So if the court were to strike down regulation best interest, and this goes back to the commission to decide what to do next, there is no mandate from Congress that it has to act. And that's a major redressability problem, because it's going to revert to, again, a suitability regime that is less protective of investor interests, meaning less likely to ameliorate the harms they're complaining about, and we'll get to their harms in a second, than what regulation best interest did. There's also a causation issue here, because in their declarations, what the petitions are citing is an existing harm, and then nothing more than an assumption that the harm will continue. But regulation best interest is imposing new obligations and new legal exposure on broker-dealers in order to protect investors. So there's a separate causation issue. And then they also haven't proven injury. What you're hearing from, not so much from the states, for example, in a recent oral argument, is a conjectural argument about the proof, because they're comparing a suitability regime, what existed before, to a hypothetical fiduciary standard. A hypothetical, I note, that they never define what is meant by fiduciary, rather than showing a harm that stems from what regulation best interest actually requires. So just as an example to take the states, the states are speculating that imposing what they view as a fiduciary standard will increase their tax revenues from investment returns, which will have a bunch of follow-on effects from public fisc. But investment returns and the tax revenues derived from them, those turn on many variables. And as the commission pointed out in its release, imposing a fiduciary standard may, in fact, end up in lower tax revenues, because investors may either pay more for or can't obtain advice at all, locking them out of a certain aspect of the investment market. So I do want to turn and talk about the merits, but I just wanted to pause because I didn't want to cut off any questions about standing. Okay, then I will turn to the merits. I want to emphasize, and I agree with what XYPN said, that this is all about the plain text. This is a straight textual reading, and in our view, the text of the Dodd-Frank Act, Section 913, amending the Exchange Act, is the start and end point. Both 913F and 913G use the word may, not shall, when authorizing commission rulemaking. And as this Court knows from many cases, may is classic discretionary language. In this particular sub-unit of Dodd-Frank, Section 913, Congress showed that it knew how to mandate action using the word shall when it wanted to. And in Dodd-Frank more broadly, Congress absolutely knew how to use the word shall. There are over 100 mandatory rulemaking provisions in Dodd-Frank, many of which are directed towards the commission. If Congress had wanted the commission to act here or to act in a particular way, it would have used the word shall, not may. This is Judge Nardini. I'm sorry to interrupt again, but I understand the argument about may and shall. Can you explain then what is the purpose of Subsection G? Sure. Was it just a really strong hint about what the SEC could do, hint, hint, but we're not going to make you do it, but it'd be awfully nice if you did it, but if you don't, well, whatever? I mean, is that all it is? No. Just a big, heavy, but optional hint? No, and I think there's two answers to your Honor's question. The first is that putting 913G in there ensures that the commission could adopt a uniform standard, even if the 913B study, the study that was required by 913B and 913C, even if that had recommended against the uniform standard, it would have ensured that the commission still had the power to impose its uniform standard. It also decreased the chance of a legal challenge to a uniform standard that could result from the broker-dealer exclusion. As you heard a lot about the broker-dealer exclusion from the states, you have to remember Congress didn't touch the broker-dealer exclusion as part of Dodd-Frank. So putting 913G in there then preserves, if the commission had gone down the uniform fiduciary standard route, would give it some insulation from a challenge that the commission, by doing so, would have been violating the broker-dealer exclusion or somehow acting contrary to the Advisors Act. So the notion, just to follow up, is that if the study had recommended against that uniform standard and the SEC had decided nevertheless to go with it, G would have prevented any successful litigation claiming that its adoption of a uniform standard was arbitrary capricious because it would have been directly authorized by statute. Is that sort of another way of putting your point? Yes, that's the gist of it. With one other, not a caveat, but one additional point, which is that 913G puts in certain, for lack of a better word, guardrails, in the sense that there's things that if the commission were to go down the 913G path, it had to put in certain things to preserve aspects of the broker-dealer model. So even though the entire language of the statute and whether the commission has to act is couched in terms of may, if it goes down that road, there are certain shells in there, such as that relating to commission, proprietary products, things like that. And just to move away from the text for a second to context and structure of 913, looking at it from that perspective simply confirms the plain textual reading. So you have sections 913B through F, which are all grouped under the heading rulemaking. They're codified as notes to section 15, and they're all internally linked by cross-references. But critically, there is no cross-reference to 913G because 913G is a separate grant of authority. And 913G, in turn, contains no cross-reference back to 913F. And this is significant for a few reasons. First, because once codified, 913F and 913G are not actually adjacent. They're separated by about five pages of the U.S. Code. So if you're looking for some sort of the idea that 913G provides the substance for 913F, that's just not the way Congress writes statutes. When it does, it will put in a cross-reference to what are the substantive standards an agency has to follow. And in Dodd-Frank, Section 932A4, a mandatory rulemaking provision for the commission, provides a perfect example of that. So usually when Congress wants to yoke provisions together, it provides an express link. So I just fundamentally disagree with XYPN's argument that the commence language sort of suggests that all the commission could do under 913F was just start the rulemaking process but couldn't finish it. To begin with, there's actually plenty of statutes that Congress has passed that use the commence rulemaking language. And just to use one example, an oldie but a goodie from a commission's perspective, is the Pennystock Act of 1990. 104 Stat 931, 932, which is codified as the notes to 15 U.S.C. 77G. That has a similar commission commence rulemaking formulation. The difference there is that Congress used a shall word. The fact that it would be very unique among the U.S. Code, perhaps a one and only, if the idea were that all the commission could do was to commence a rulemaking process under 913F and do nothing more. And here's a chance where it may actually be worthwhile to look back at either legislative or, as you should call it, statutory history. It must be remembered that Section 913 was a compromise between a House bill that mandated the commission create a uniform standard, using the word shall, and a Senate bill that mandated some rulemaking but didn't specify the standard. 913F derived from that Senate bill. And the initial version of the Senate bill, I shouldn't say the initial, the version of the bill that passed the Senate required the commission to commence a rulemaking within a certain amount of time. I believe it was two years. What happened in the final version of 913 is Congress changed shall to may, and because there's no longer a mandatory rulemaking provision, it removed the time period. But it kept the commence language. Excuse me, we have one more minute. Thank you very much. I don't see, I don't think there's any suggestion that if only the Senate bill had passed, all the commission could do is commence a rulemaking, but not finish it. Particularly when you realize that the term rulemaking is a defined term of the APA, and includes not just that beginning of the rulemaking process, but also the finalization and publication of the rule. I want to just finish with one other point, which is that ultimately petitioners really aren't actually adhering to the text. They're ignoring the text. And they're asking this court to conclude that Congress had an unwritten purpose to effectively collapse the broker-dealer and investment advisor markets. But it simply doesn't make sense that Congress ordered the commission to study all these different potential regulatory approaches and all these different issues that could factor into those regulatory approaches. If the commission had only one choice, which was to impose a uniform fiduciary duty, if Congress had wanted to treat brokers and advisors the same, it could have eliminated the broker-dealer exclusion from the Advisors Act, something it absolutely did not do. It could have directly itself imposed a fiduciary duty on broker-dealer, as it did in other provisions of Dodd-Frank Act, or it could have mandated a rulemaking where the commission adopted uniform fiduciary standard that Congress envisioned. But it did none of those things. I believe I'm over my time, so I will sit down, so to speak, unless the court has any other questions. All right. Thank you, Mr. Berger. We'll now hear from Ms. Murdukayeva for two minutes. Thank you, Your Honor. I'd like to make two points about standing and one point about our statutory argument. With respect to standing, the standing inquiry requires the court to assume that petitioners prevail on the merits. On the merits, our position is that the SEC was required to do something, that is, impose the fiduciary standard as a matter of statute. Therefore, the correct comparison is between the agency's action or inaction and the statutory mandate, not the existing status quo, which itself fails to satisfy the statute. Second, we have also established injury. It is established as a matter of standing law that standing is not about the quantum of injury but about the existence of injury. And the final rule itself acknowledges at least a harm of between $4.1 and $9.7 billion from conflicted advice by broker-dealers and the mutual fund market alone. We think that the harm is much higher, but even if there is some dispute about the magnitude, the existence of the harm is not disputed, and the state petitioner's injury to their tax revenues and to their public expenditures is fairly traceable to these harms. With respect to our statutory argument, counsel for the SEC just noted that Congress at the time of passing the Dodd-Frank Act did not repeal the solely incidental exception or modify it. It did not have to. Congress did not need to amend the statute to cover personalized investment advice by broker-dealers because the statute already covered it, subject to the solely incidental exception. To the contrary, Congress would have needed to amend the statute to adopt the SEC's conclusion that the broker-dealer exception covers any advice that is, quote, reasonably related to brokerage. But words solely incidental do not mean reasonably related, as the SEC has interpreted them. For that to be true, Congress would have needed to amend the statutory definition, and the SEC cannot expand that statutory exception by matter of regulation. And I would note it's important that the SEC has previously tried to do the same thing to the broker-dealer exception in the 1999 rule that was eventually vacated by the D.C. Circuit. And at that time, the D.C. Circuit said the same thing that we are saying now, which is that the SEC is not authorized by statute to exclude broker-dealers from coverage under the Advisories Act, except under the narrow terms that Congress has already specified, and the SEC has exceeded those narrow terms here. Okay. Any questions? All right. Thank you, Ms. Mordocay. We'll now hear from Mr. Guptak for a minute. Thank you. I'll try to be brief. I think the panel understands our position on standing and our interpretation of the procedural versus substantive provisions of the Dodd-Frank Act. So I just want to highlight one additional argument that we emphasized in our papers, where, again, I think our position is slightly different from the state's but complementary, and that is our position on what the Investment Advisors Act of 1940 requires. It's not our view that that act in itself required the SEC to do anything with respect to rulemaking. But once the agency issued its regulation, to the extent that its regulation rested on an interpretation of law, it had an obligation to ensure that that interpretation of law is consistent with the act, that there's a reasonable interpretation of the act. And the problem for the SEC is that it does not have a reasonable account of the key phrase in the broker-dealer exception solely incidental. This is the same exception that last time the agency wrote a regulation to interpret the rule was vacated by the D.C. Circuit for violating the plain text of the statute. We think the departure from statutory text here is even more apparent because the regulation is premised on an interpretation under which a broker can hold itself out to the public as an investment advisor, can provide frequent and significant investment advice to its clients, and generate substantial revenue from that advice as part of its business model. No reasonable interpretation of the broker-dealer exception to the Investment Advisors Act supports that interpretation on which the regulation is premised. Could you just point to the very specific part of the record of the proposed rule that embodies that, what you claim is a misinterpretation of the incidental language? Yes. Well, so first of all, I'll emphasize that the interpretation is embodied in a separate interpretation that the agency put out. Now, obviously— That's what I thought, and that's why I'm puzzled as to why you're challenging that in the context of this challenge to the regulation. Right, right. Obviously, we could not challenge that on its own. The agency faults us for not challenging that interpretation, but one cannot challenge an interpretive rule. But the Supreme Court and this circuit have never held that an agency can promulgate a rule that rests entirely on an interpretation and insulate that interpretation from challenge, what would otherwise be challengeable, simply by putting it in another document. As our briefs point out, the regulation cites multiple times to the interpretation, and the SEC itself says at page 60 of its brief, it concedes that the rule presumes a certain understanding of the exclusion when providing a recommendation subject to the rule. That is exactly our point. The SEC's rule rests entirely on a certain understanding of which firms and activities the rule would cover, and in our view, that understanding is wrong. And so that is a form of—a species of arbitrary and capricious rulemaking. It's not the standard we're used to, the idea that arbitrary and capricious rulemaking concerns some kind of policy judgment, but it is also arbitrary and capricious when an agency issues a regulation that rests on an unreasonable construction of the statute. Thank you very much. We will reserve decision, but thanks for the argument. It was well argued. Thank you.